**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **Freddie Lee Mitchell,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:13-01398** |
| **v.** | ) | **Judge Haynes/Brown** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **ACTING COMMISSIONER** | ) | |
| **OF SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**To: The Honorable William J. Haynes, Jr., United States District Judge.**

<u>**REPORT AND RECOMMENDATION**</u>

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration ("the SSA"), through its Commissioner ("the Commissioner"), denying plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i) and 423(d), and Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq*. For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 12) be **DENIED** and the Commissioner's decision **AFFIRMED**.

**I. PROCEDURAL HISTORY**

Plaintiff filed for DIB on March 11, 2012 and SSI on April 24, 2012. (Doc. 10, p. 14)[1] Plaintiff alleged a disability onset date of January 1, 2009 for both. (Doc. 10, p. 14) Plaintiff claimed that he was unable to work because of knee problems, diabetes, vision problems, obesity, hypertension, and mental issues. (Doc. 12, pp. 131-32) The claims were denied initially on August

---

[1] References to page numbers in the Administrative Record (Doc. 10) are to the page numbers that appear in **bold** in the lower right corner of each page.

7, 2012 (Doc. 10, pp. 93-94), and upon reconsideration on December 5, 2012 (Doc. 10, pp. 124-25).

On January 9, 2013, plaintiff requested a hearing before an administrative law judge (ALJ) (Doc. 10, pp. 146-48)  A hearing was held June 18, 2013 before ALJ Scott C. Shimer.  (Doc. 10, pp. 33-72)  Vocational expert (VE) Charles Wheeler testified at the hearing.  (Doc. 10, pp. 68-70)  Plaintiff was represented by counsel at the hearing.  (Doc. 10, p. 33)

The ALJ entered an unfavorable decision on July 7, 2013.  (Doc. 10, pp. 11-32)  Plaintiff filed a request with the Appeals Council on September 8, 2013 to review the ALJ's decision.  (Doc. 10, pp. 6-10)  The Appeals Council denied plaintiff's request on October 17, 2013, whereupon the ALJ's decision became the final decision of the Commissioner.  (Doc. 10, pp. 1-5)

Counsel brought this action on plaintiff's behalf on December 13, 2013.  (Doc. 1)  Plaintiff filed a motion for judgment on the administrative record on April 9, 2014 (Doc. 12), the Commissioner responded on August 7, 2014 (Doc. 18), and plaintiff replied on August 22, 2014 (Doc. 21).  This matter is now properly before the court.

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence

Plaintiff has provided 740-plus pages of medical records from the Tennessee Department of Correction (TDOC) covering the period June 9, 2011 to February 17, 2012.  (Doc. 10, pp. 250-324, 504-1170)  The TDOC records generally comprise medication administration and drug request forms, physician's orders, raw laboratory results, immunization records, progress reports, treatment plans, etc.

Dr. Lloyd Huang, M.D., an examining, nontreating source, examined plaintiff consultively on June 15, 2012.[2]  (Doc. 10, pp. 325-28)  Doctor Huang, provided a written report of his

---

[2]  There are no treating sources in this case as defined by 20 C.F.R. § 404.1502.

examination, and completed a physical medical source statement (MSS). (Doc. 10, pp. 326-34)

A box captioned 'VISION CHECK" in Dr. Huang's handwritten clinical notes shows that plaintiff's uncorrected vision was 20/70 in each eye tested separately, and when tested together, and that his corrected vision was 20/15 in each eye tested separately, and when tested together. (Doc. 10, p. 325) The MSS assesses plaintiff as able to perform work at the light exertional level with the following relevant postural, manipulative, and environmental limitations: 1) standing 4 hrs. total in an 8 hr. workday, 2) occasional exposure to humidity, wetness, and extreme cold; 3) moderate noise. (Doc. 10, pp. 329-34) The MSS makes no reference to any visual limitations. (Doc. 10, p. 332)

Doctor Thelma Foley, Ed.D., an examining, nontreating source, conducted a mental status examination of plaintiff on July 10, 2012. (Doc. 10, pp. 336-38) Doctor Foley noted that "[n]o medical records were sent to [her]," but plaintiff "was an adequate personal historian." (Doc. 10, p. 336) Doctor Foley made the following relevant observations in her report based on plaintiff's subjective representations: 1) "he usually gets along with people but sometimes gets angry and yells"; 2) "[a]lthough he was friendly and cooperative today his history suggests that he gets angry easily which would cause him difficulty in a work setting." (Doc. 10, p. 338)

Plaintiff presented multiple times to the Mental Health Cooperative (MHC) from July 23, 2012 to September 7, 2012. (Doc. 10, pp. 354-409) Plaintiff was evaluated by psychiatrists Dr. Thomas Lavie, M.D., and Dr. Carmel Lakhani, M.D., both examining, nontreating sources. (Doc. 10, pp. 364-65, 397-98) Dr. Lavie wrote the following in his July 24, 2012 mental status exam:

> Current mental status exam is unremarkable for any significant psychopathology, other than depression and psychomotor retardation. . . . There was no evidence of psychosis, mania, hypomania, sustained clinical depression or severe anxiety. Thought flow was coherent. No hallucinations currently, no delusions revealed. Level of consciousness was stable and alert. There was no evidence of movement disorder or psychomotor retardation or psychomotor agitation. Fred denied current suicide ideation.

(Doc. 10, pp. 364-65)  Doctor Lakhani repeated Dr. Lavie's mental assessment verbatim in her July 27, 2012 report.  (Doc. 10, p. 396)  A MHC progress note dated August 3, 2012 recorded that plaintiff threatened to commit suicide if he were required to leave Room in the Inn (RITI) where MHC had arranged for him to stay temporarily.  (Doc. 10, p. 402)  A MHC progress note dated August 10, 2012 reported that plaintiff also left a letter in the waiting room of a clinic threatening to commit suicide if he were required to leave RITI.  (Doc. 10, p. 403)

Plaintiff was seen at the Middle Tennessee Mental Health Institute (MTMHI) September 7, 2012 for suicidal ideations (SI).  (Doc. 10, pp. 410-412)  The MTMHI record notes that plaintiff's complaint was that he "need[ed] a place to stay," that his representations of SI were "exaggerated," and that he was "malingering for housing."  (Doc. 10, pp. 411-12)

Plaintiff was treated at the Nashville General Hospital Emergency Department (ED) on September 13, 2012.  (Doc. 10, pp. 413-20)  The ED report notes that plaintiff intentionally took an overdose of insulin "in an attempt to avoid arrest."  (Doc. 10, p. 414)

Plaintiff was treated at United Neighborhood Health Services (UNHS) from May 9, 2012 to October 12, 2012.  (Doc. 10, pp. 479-502)  Doctor Ada-Nkem Emuwa, M.D., noted following plaintiff's initial visit on May 9, 2012 that he exhibited "[m]ild depression," but "[s]ymptoms are improved on medications . . . ."  (Doc. 10, pp. 479-80)  Mary Carter conducted plaintiff's initial psychiatric evaluation on May 18, 2012.  (Doc. 10, pp. 481-83)  Plaintiff represented to Ms. Carter on June 1, 2012 that he was "[l]ooking forward to finding a job now that he ha[d] an ID."  (Doc. 10, p. 484)  Plaintiff also admitted throughout this period that he was not compliant with his medications. (Doc. 10, pp. 481, 487-88, 490-91, 493) Plaintiff's Global Assessment of Functioning (GAF) score was 30-40 during this time frame.  (Doc. 10, pp. 483, 485, 488, 492, 502)

Dr. Sannagai Brown, M.D., a nonexamining, nontreating source, conducted a physical

residual functional capacity (RFC) assessment of plaintiff on initial review on July 9, 2012. (Doc. 10, pp. 87-90) Doctor Brown noted that plaintiff had "20/70 corrected bilateral exam," and that a "[c]omplete vision exam need[ed] to be performed." (Doc. 10, p. 88) Doctor Brown nevertheless determined that plaintiff could perform past relevant work (PRW) as "[a]ctually [p]erformed" and that, although "[t]he evidence shows that the individual ha[d] some limitations in the performance of certain work activities . . . these limitations would not prevent . . . [him] . . . from performing [PRW] work as a/an Parking Attendant." (Doc. 10, p. 91) Dr. Brown determined that plaintiff was not disabled. (Doc. 10, p. 92)

On November 19, 2012, Dr. Rebecca Sweeney, Ph.D., a nonexamining, nontreating source, conducted a mental RFC assessment upon reconsideration of the denial of plaintiff's application for benefits. (Doc. 10, pp. 108-110) Basing her opinion solely on Dr. Foley's assessment, Dr. Sweeney determined that plaintiff "ha[d] the ability to relate appropriately to supervisors and frequently with co-workers and with the general public." (Doc. 10, pp. 105, 110)(capitalization omitted)

On November 21, 2012, Dr. Karla Montague-Brown, M.D., a nonexamining, nontreating source, conducted a physical RFC assessment upon reconsideration of the denial of plaintiff's application. (Doc. 10, pp. 105-08) Doctor Montague-Brown noted that plaintiff had "G20/70 corrected bilateral exam," and that the SSA would "need opthal[mologist] if gross vision results in AL." (Doc. 10, p. 107) As Dr. Brown before her, Dr. Montague-Brown determined that plaintiff could perform PRW as "[a]ctually [p]erformed" and that, although "[t]he evidence shows that the individual has some limitations in the performance of certain work activities . . . these limitations would not prevent the individual from performing [PRW] as a/an Parking Attendant." (Doc. 10, p. 112) Dr. Montague-Brown also determined that plaintiff was not disabled. (Doc. 10, p. 113)

Plaintiff has provided additional records from UNHS for the period October 19, 2012 to

April 1, 2013. (Doc. 10, pp. 1172-1259) Ms. Jennifer Strickland, a UNHS behavioral specialist, noted on February 1, 2013 that plaintiff: 1) admitted "he sold his food stamps for money and has been buying candy and clothes" (Doc. 10, p. 1200); 2) stated on February 15, 2013 that he "[w]ant[ed] to . . . maintain contact with . . . friend, Debbie" (Doc. 10, p. 1188); 3) reported on March 15, 2013 that he had been "horse 'playing' with 'a friend'" and that "several peers . . . h[ad] befriended him and [we]re encouraging him" (Doc. 10, p. 1176). Plaintiff also admitted throughout this period that he was not compliant with his medications. (Doc. 10, pp. 1178, 1196, 1200, 1208, 1212, 1218) Plaintiff's GAF score during this period was 40-50. (Doc. 10, pp. 1173, 1175, 1177, 1183, 1185, 1189, 1195, 1201, 1213, 1215, 1217, 1231, 1233, 1238, 1243, 1245, 1247, 1249, 1259)

Finally, plaintiff has provided a letter dated February 25, 2013 from Ms. Strickland. (Doc. 10, p. 1171) Ms. Strickland's letter describes generally the services UNHS had provided plaintiff since May 9, 2002, but it does not address any objective medical evidence or determinations made as to plaintiff's alleged medical and/or mental issues.

### B. Transcript of the Hearing

Plaintiff testified upon questioning by the ALJ that he worked previously as a parking lot attendant which was primarily a sitting job that required him to take tickets from parking patrons, make change, and make a 15 to 20 minute walking check of the garage at least twice a night. (Doc. 10, pp. 38-40) Plaintiff also testified that he worked 8 hours a day 6 to 7 days a week while imprisoned writing down the names of prisoners who checked out cleaning supplies, and that he was given help only when he was close to being released. (Doc. 10, pp. 42-43)

Plaintiff testified upon questioning by counsel that his legs and bipolar disorder prevented him from going to work. (Doc. 10, p. 44) He testified that he didn't get along with people, preferred to stay by himself, had relapses of depression and suicidal thoughts, and became angry when people

got too close.  (Doc. 10, p. 44)  On the other hand, plaintiff testified that he did not have "too much" trouble getting along with others while he was incarcerated.  (Doc. 10, p. 45)  Plaintiff did admit, however, that he got into an argument with another inmate over the latter's signature while helping corrections officers deliver commissary, and the other inmate's "friend came downstairs and said, don't mess with Muslims . . . and beat [him] up."  (Doc. 10, p. 45)  This, according to plaintiff, was the only time he got into an altercation in the nearly 7 years he was incarcerated.  (Doc. 10, p. 45) Plaintiff testified that he had lived at the Mission since September 2012, that "about 600" people lived there, that he left the mission during the day, and he sometimes went to the library where he could "read and get away from people."  (Doc. 10, pp. 47-48)

The ALJ asked plaintiff about an incident that had occurred when plaintiff was residing at a boarding house after his release from prison when he stopped taking his medication to prove he had a mental illness in an effort to prevent being evicted.  (Doc. 10, p. 50)  Plaintiff denied at first that stopped taking his medication to prove he had a mental illness, but then testified that he did not remember.  (Doc. 10, p. 51)  The ALJ asked plaintiff if he knew why "the mental health co-op would [say] that [he] quit taking [his] medication . . . if [he] didn't tell them that?"  (Doc. 10, p. 52) Plaintiff said he did not know, but admitted it was "likely" he told the co-op that and did not remember, and if he did, there was no reason to believe that it was not the truth.  (Doc. 10, p. 52)

Counsel asked plaintiff again what physical problems kept him from working, to which plaintiff replied at first, "[m]y legs."  (Doc. 10, p. 57)  Plaintiff also testified that he had problems sitting, that he could only sit 30 minutes before he had to get up and move around, that he could stand for only 5 minutes, that he could walk for about an hour, and that it was easier for him to walk than to stand.  (Doc. 10, p. 58)  Plaintiff testified that he only could lift 10 to 15 pounds because his legs and hip hurt, and that he was in pain even lifting while seated.  (Doc. 10, pp. 58-59)  Plaintiff

testified that his high blood pressure caused him to get light-headed and feel hot, but that it did not happen "too often now," that his diabetes was not well controlled, and that he "[j]ust d[id]n't feel good" when his blood sugar level was high. (Doc. 10, p. 59) According to plaintiff, his high blood sugar levels also kept him from wanting to go anywhere "[a]bout two or three times a week." (Doc. 10, p. 60) Finally, plaintiff testified that he had a vein condition in his "right leg back last June," but the problem had been resolved. (Doc. 10, p. 60)

The ALJ asked plaintiff when he last had an eye exam. (Doc. 10, p. 61) Plaintiff responded that he last had an eye exam "[a]bout eight years ago," and that the bifocals he was wearing at the hearing had been prescribed while he was incarcerated. (Doc. 10, p. 61) Plaintiff characterized his distance vision as "[s]o-so," and that he had to take his glasses off to read. (Doc. 10, p. 61) When the ALJ asked: "So the bifocals aren't working for you, like they used to, is that what you're telling me," plaintiff replied, "Yes, sir." (Doc. 10, pp. 61-62)

Plaintiff testified that he either walked or took the bus to the library, and that he had no problems taking the bus. (Doc. 10, p. 62) Plaintiff testified further that he walked "[a]bout an hour" to get to the hearing. (Doc. 10, p. 62) When asked about having to walk up and down hills, plaintiff replied that he "had to stop and sit down" about 4 times on the way. (Doc. 10, pp. 62-63)

The ALJ asked plaintiff if he still volunteered at the mission. (Doc. 10, p. 63) Plaintiff finally admitted that had been fired for taking a $2.00 bribe from another homeless person to cut in line ahead of others waiting for a bed ticket. (Doc. 10, pp. 64-65) Plaintiff testified that he "enjoy[ed] doing volunteer work," and later got into an argument with "one of the other guys in the shower room," that he did not remember what the argument was about, but it "[go]t on [his] nerves . . . [so he] . . . walked out . . . [c]ontemplated suicide for a little while . . . [and] he [w]ent outside and cooled off." (Doc. 10, pp. 65-66) Plaintiff admitted under further questioning that his SI claims

were exaggerated.  (Doc. 10, p. 66)

The ALJ then questioned the VE, who characterized plaintiff's last work as a parking lot attendant, DOT 915.473-010.  (Doc. 10, p. 68)  The VE testified that a parking lot attendant "could be more in the sedentary range, rather than light, but generally the DOT describes parking attendants as light."  (Doc. 10, p. 69)  The ALJ presented the following hypothetical to the VE:

> [A]ssume a person of the claimant's age, education, past work experience as the parking attendant, and then we assume that this individual is restricted to light, exertional-level work, with frequent balancing and stooping, and only occasional crouching, kneeling, and crawling.  No climbing ladders, ropes, and scaffolding.  Occasionally climbing ramps and stairs.  Would need a job that involves simple, routine, repetitive tasks, and lower level detail type of tasks.  But not multi-step, detailed tasks, or with executive level-type decisions.  No working at unprotected heights, or around unguarded moving machinery.  And would need a sit/stand option every hour or so.  Would the past work be available either as described . . . by the claimant, or performed by the claimant, or as described in the Dictionary of Occupational Titles?

(Doc. 10, p. 69)  The VE testified that the hypothetical person could perform the work as described by plaintiff.  (Doc. 10, p. 69)  The ALJ then asked: "If we added to that standing and walking were limited to a total of four out of eight hours in a workday, with those same limitations, would that still be the case?"  (Doc. 10, pp. 69-70)  The VE replied, "Yes, it would."  (Doc. 10, p. 70)  The ALJ then asked the VE: "What about if the claimant was limited to frequent contact with the general public, co-workers, and supervisors.  Would that parking lot attendant have more than frequent . . . two-thirds of the day, contact with public co-workers or supervisors?"  (Doc. 10, p. 70)  The VE testified that the position would be eliminated on that ground.  (Doc. 10, p. 70)

### C.  The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if she can show her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process to determine whether an individual is "disabled" within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2014). While the claimant bears the burden of proof at steps one through four, the burden shifts to the Commissioner at step five to identify a significant number of jobs in the economy that accommodate the claimant's RFC and vocational profile. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

The SSA's burden at step five may be met by relying on the *Medical-Vocational Guidelines*, known in the practice as "the grids," but only if the claimant is not significantly limited by nonexertional impairment, and then only when "the characteristics of the claimant exactly match the characteristics of one of the rules." *Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003). In cases where the grids do not direct a conclusion as to the claimant's capacity, the SSA must come forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through the testimony of a VE. *See Wright*, 321 F.3d at 616 (citing SSR 83-12, 1983 WL 31253 (SSA)). In determining the claimant's RFC for purpose of the analysis at steps four and five, the SSA is required to consider the combined effect of all the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), (5)(B); 20 C.F.R., 404.1523; 404.1545(a)(2); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 725-26 (6th Cir. 2014).

### III. ANALYSIS

### A. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record, and whether the decision was made pursuant to proper legal standards. 42 U.S.C. § 405(g); *Gayheart*,

710 F.3d at 374 (internal citations and quotation marks omitted). Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see Gentry*, 741 F.3d at 722 (internal citation omitted). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence also could support a different conclusion. *Gayheart*, 710 F.3d at 374 (internal citation omitted). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6ᵗʰ Cir. 2006).

### B. Claims of Error

### 1. Whether the ALJ Erred at Step Four in Determining That Plaintiff Had the RFC to Perform PRW as a Parking Lot Attendant (Doc. 12-1, pp. 11-14)

Plaintiff asserts in his first claim of error that the ALJ erred in determining that he was able to return to his PRW as a parking lot attendant. (Doc. 12-1, p. 11) Plaintiff claims that the ALJ's decision was inconsistent with "all of the medical opinions or record," and that he failed to "address or resolve . . . significant inconsistencies." (Doc. 12-1, p. 11)

Plaintiff's argues first that the ALJ erred in rejecting aspects of Dr. Huang's opinion, to which the ALJ otherwise attributed significant weight, in favor of State agency medical consultants Drs. Brown and Montague-Brown, to whose opinions the ALJ attributed significant weight as to those parts of Dr. Huang's opinion that he rejected. Plaintiff argues specifically that the ALJ failed to discuss the opinions of Drs. Brown and Montague-Brown concerning his alleged visual acuity limitations. (Doc. 12-1, pp. 11-12)

The ALJ's RFC assessment is required to include "medically determinable impairment(s) such as . . . impairment(s) of vision . . . which . . . may cause limitations and restrictions which affect

other work-related abilities." 20 C.F.R. § 404.1545(d). The issue here turns on whether plaintiff had a visual acuity limitation.

First, as an examining, non-treating source, Dr. Huang's opinion was entitled to greater weight than the opinions of Drs. Brown and Montague-Brown, both of whom were nontreating, non-examining sources. *See Gayheart*, 710 F.3d at 375 (quoting Soc. Sec. Rul. No. 96–6p, 1996 WL 374180 at *2 (Soc. Sec. Admin. July 2, 1996)). More importantly, however, Dr. Huang did not note any visual impairments in the MSS. (Doc. 10, p. 332) The absence of any noted visual impairment, as explained above at p. 3, is due to the fact that plaintiff's corrected vision was 20/15, not 20/27 as both Drs. Brown and Montague-Brown reported.[3] In short, plaintiff's corrected vision was such that he can see at 20 ft. what the normal person with 20/20 vision can only see at 15 ft.

That plaintiff's corrected vision was noted as 20/15 in Dr. Huang's clinical notes, the fact that Dr. Huang did not note any visual limitations in the MSS, and plaintiff's testimony at the hearing that his vision problems were due to his prescription being at least 8 years old constitute substantial evidence that plaintiff did not have a visual acuity impairment. Absent any visual acuity impairment, the ALJ was not required to discuss the issue in his RFC assessment, nor was he required to explain why he did not address the opinions of Drs. Brown and Montague-Brown on the subject. Plaintiff's first argument is without merit.

Plaintiff argues next that the ALJ did not address that Dr. Brown appeared to determine that he was "limit[ed] . . . to a maximum sustained work capability for only sedentary work." (Doc. 12-

---

[3] Doctors Brown and Montague-Brown appear to have been misled by a transcription error from the vision check results in the box labeled "VISION CHECK" in Dr. Huang's handwritten clinical notes, *i.e.*, that plaintiff's uncorrected vision was 20/70, and that his corrected vision was 20/15, and Dr. Huang's typewritten report in which he wrote: "Vision corrected is 20/70 in both eyes and combined is 20/15." (Doc. 10, p. 327) Neither Dr. Brown nor Dr. Montague-Brown appear to have been aware of the "VISION CHECK" results. Had they been, they would have reported that plaintiff's corrected vision was 20/15, not 20/70.

1, p. 12) Plaintiff fails to provide any argument, factual allegations, reference to the record, or citation to relevant authority in support of this apparent argument. The district court is not obligated on judicial review to supply factual allegations in support of claims where no facts are alleged. *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006)("[W]e decline to formulate arguments on [appellant's] behalf"). Consequently, this argument is waived. *See Moore v. Comm'r of Soc. Sec.*, 573 Fed.Appx. 540, 543 (6th Cir. 2014)(citing *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010)("Issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

Plaintiff argues next that "Dr. Sweeney opined . . . [he] . . . ha[d] moderate limitations in social functioning, including moderate limitations in interacting with the general public, coworkers, and supervisors, and would only be able to have frequent interaction with them." (Doc. 12-1, p. 12) Plaintiff argues that "this is . . . inconsistent with the position of parking attendant, which would require essentially constant interaction with others in order to perform the job." (Doc. 12-1, p. 12) Plaintiff also argues that the ALJ provided insufficient reasoning for not adopting Dr. Sweeney's assessment. (Doc. 12-1, p. 12)

As noted above at pp. 3 and 5, Dr. Foley based her assessment solely on plaintiff's subjective representations, and Dr. Sweeney, in turn, based her assessment solely on Dr. Foley's assessment. Consequently, Dr. Sweeney's assessment that plaintiff had the ability to relate only "frequently" with co-workers and the general public was based *a priori* on plaintiff's subjective representations to Dr. Foley.

"[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability." *Cruse v. Comm'r of Soc.*

*Sec.*, 502 F.3d 532, 542 (6th Cir. 2007)(citations omitted). "[A]n ALJ's credibility determinations . . . are to be given great weight . . . . [but] they must . . . be supported by substantial evidence." *Cruse*, 502 F.3d at 542 (citations omitted); SSR 96-7p, 1996 WL 374186 (SSA).

The ALJ wrote that plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [we]re not entirely credible for the reasons explained in this decision." (Doc. 10, p. 24)  The ALJ noted the following in his decision relevant to plaintiff's credibility:[4] 1) "he . . . went to a community center" regularly (Doc. 10, pp. 18, 229); 2) "he denied ever being fired or laid off from a job because of problems getting along with others" (Doc. 10, pp. 18, 231); 3) he did "group chores at the halfway house . . . ." (Doc. 10, pp. 18, 337); 4) he took computer classes, went to the library regularly, and to church every Sunday (Doc. 10, pp. 18, 24, 337, 1258); 5) "he usually g[ot] along well with people" (Doc. 10, pp. 18, 337-38); 6) he had a friend in Knoxville with whom he spoke on the telephone (Doc. 10, pp. 18, 337); 7) "he took an overdose of insulin in an attempt to avoid an arrest" (Doc. 10, pp. 21, 25, 414, 501); 8) he "reported selling his food stamps to buy candy and clothes" (Doc. 10, pp. 22, 1200); 9) he reported horse-playing with a friend (Doc. 10, pp. 22, 1176); 10) he volunteered at the Mission where he lived with about 600 other people (Doc. 10, pp. 18, 22-26, 47, 1184, 1194, 1232): 11)"he was looking forward to finding a job no[w] that he had an ID" (Doc. 10, pp. 23, 484); 12) he "stopped taking his medications to prove to [the] boarding home staff that he had a mental illness" (Doc. 10, pp. 23, 25, 50-51, 354, 369, 369); 13) "[h]e admitted that he exaggerated his complaints of suicidal ideation and psychosis because he needed a place to stay" (Doc. 10, pp. 23, 25, 66, 403-04, 411-12); 14) "a friend . . . dropped him off at the [SSA] field office"  (Doc. 10, pp. 24, 62); 15) "Dr. Foley . . . described [him] as being 'friendly' and 'cooperative'" (Doc. 10, pp. 24, 338); 16) he was "only involved in one altercation

---

[4]  The page numbers in the record referred to in this paragraph include the related evidence in the record.

during his [nearly 7-year] incarceration, but his testimony suggests that he did not instigate" it (Doc. 10, pp. 25, 45); 17) "he . . . work[ed] handing out cleaning supplies" to other inmates (Doc. 10, pp. 25, 42); 18) "he was fired" from his volunteer job at the Mission "for [a bribe] in exchange for a pass" (Doc. 10, pp. 25, 64-65).

As shown above, plaintiff has individual friends, and generally gets along well with others. Going to a community center, taking classes, going to church/chapel, going to the library, doing group chores, and taking public transportation demonstrates plaintiff's ability to interact with small- to mid-sized groups of people when it is necessary, or when it suits his purpose. Plaintiff's ability to function in larger groups is demonstrated by his nearly-seven years in TDOC living and working with other prisoners, many of whom have decidedly antisocial traits, and the fact that he lived, worked, and socialized at a rescue mission for several months with six hundred other homeless people. The record shows that plaintiff exaggerated/lied about his symptoms and limitations for personal gain, he engaged in acts of outright dishonesty, and he flaunted the special trust and confidence vested in him by those trying to help him. In short, the ALJ's determination that plaintiff was not credible as to the "intensity, persistence and limiting effects of [his] symptoms . . . ." is supported by substantial evidence. Because plaintiff's psychological and social functioning claims were not credible, the ALJ was not required to accept Dr. Sweeney's assessment based on plaintiff's subjective complaints. This argument is without merit.[5]

Plaintiff argues next that the ALJ "'cherry-picked'" the limitations from the opinions of the consultative opinions that were not disabling, and rejected the remaining limitations without explaining his reasons "sufficiently." (Doc. 12-1, p. 13) Plaintiff again has not provided any

_____

[5] The Magistrate Judge notes for the record that the excerpts from the decision in the paragraph above provide ample explanation as to why the ALJ rejected Dr. Sweeney's opinion.

argument, factual allegations, reference to the record, or citation to relevant authority to support this argument. Therefore, the argument is waived for the reasons explained above at p. 13.

Plaintiff argues next that the ALJ "never resolved th[e] inconsistency between the definition of light work, requiring about six hours on one's feet," and Dr. Huang's assessment that limited plaintiff "to standing only four hours total." (Doc. 12-1, p. 13) "[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 3125 at * 6.

As noted above at p. 9, the ALJ posed a single, light-work hypothetical to the VE. The VE testified that the hypothetical person could perform the work of a parking lot attendant at the light exertional level as plaintiff described that work. The VE also testified that the hypothetical person could do so even if he were limited to not more than 4 hrs. of standing/walking in an 8 hr. workday.

The law is settled that the ALJ may rely on the VE's testimony in response to a hypothetical if the hypothetical accurately portrays the ALJ's assessment of what plaintiff can and cannot do. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). Because the ALJ's 4-hr. caveat was based on Dr. Huang's 4-hr. stand/walk limitation, to which plaintiff does not object, and because the ALJ was permitted to rely on the VE's testimony as to that limitation, the ALJ did not err in not explaining the alleged conflict. This argument is without merit.

Plaintiff argues next that the ALJ erred in determining that he could work as a parking lot attendant because the "position requires frequent exposure to weather and a 'loud' noise intensity level," whereas Dr. Huang limited plaintiff to "only occasional exposure to environmental factors and only moderate noise exposure." (Doc. 12-1, p. 13)

As noted above at p. 3, Dr. Huang limited plaintiff's exposure to humidity, wetness, extreme cold, and noise. (Doc. 10, p. 333) However, the MSS required Dr. Huang to "[i]dentify the

particular medical or clinical findings . . . which support [his] assessment or any limitations and why the findings support the assessment." (Doc. 10, p. 333) Dr. Huang did not specify any medical or clinical reasons for the limitations noted (Doc. 10, p. 333), nor is there anything in Dr. Huang's accompanying handwritten clinical notes or typewritten report that casts light on his reasoning. (Doc. 10, pp. 325-28)

The ALJ's RFC assessment is required to include only "medically determinable impairment(s) . . . which . . . may cause limitations and restrictions which affect other work-related abilities." 20 C.F.R. § 404.1545(d). Absent any medical or clinical findings, the ALJ was not required to address the limitations/restrictions at issue in his RFC determination. This argument is without merit.

Plaintiff's final argument in his first claim of error is that the ALJ did not address plaintiff's TDOC medical records "sufficiently." (Doc. 12-1, p. 13) Plaintiff refers only to a July 21, 2010 order signed by Nurse Practitioner Maria Taylor that instructed plaintiff to elevate his bilateral lower extremities above his heart for 15-30 minutes, three times per day. (Doc. 10, p. 662; Doc. 12-1, p. 14)

The record shows that the ALJ addressed plaintiff's TDOC medical records at length in the RFC assessment in terms of both his alleged physical and mental limitations. (Doc. 10, pp. 20, 22, 25) That said, plaintiff does not specify what else in the TDOC records the ALJ ought to have considered, but did not. This part of plaintiff's argument is waived for reasons explained above at p. 13. As for Nurse Taylor's entry, plaintiff once again provides no argument, factual allegations, reference(s) to the record, or citation to relevant authority in support of this part of the argument. For reasons previously explained, this part of plaintiff's argument is waived as well.

## 2. Whether the ALJ Erred in Rejecting Significant Aspects of the Opinions of Drs. Huang and Foley

Plaintiff asserts in his second claim of error that the ALJ "essentially rejected the opinions of Drs. Brown and Foley in favor of the opinions of sources who have never examined or even seen [plaintiff]," *i.e.*, Drs. Brown and Sweeney. (Doc. 12-1, p. 14) More particularly, plaintiff argues that "the ALJ provided erroneous reasons for his rejection of these aspects of the[ir] opinions . . . ."[6]

(Doc. 12-1, p. 14)

Plaintiff argues first that "the ALJ essentially 'cherry-picked' the aspects of the assessments that were not were not potentially disabling and rejected the remaining aspects, well supported by the evidence, which would likely result in a finding of disability." (Doc. 21-1, p. 14) Although he addresses the opinions of Drs. Brown and Sweeney at length, plaintiff once again provides no argument, factual allegations, reference(s) to the record. Consequently, plaintiff's argument that the ALJ "cherry picked" from the opinions is waived.

Notwithstanding the foregoing, plaintiff's principal argument is that the ALJ provided insufficient reasons for rejecting aspects of the opinions of Drs. Huang and Foley in favor of Drs. Brown and Sweeney. (Doc. 12-1, p. 14) The ALJ wrote the following as to Dr. Huang's opinion:

> Overall, a combination of non-compliance, purposeful exaggeration of symptoms, and inconsistent social activities suggest that the claimant is not as limited as he alleges. Significant weight is therefore given to Dr. Huang's medical consultive examination . . . as the light exertional limitations are consistent with his findings, the unremarkable treatment records, and the claimant's reported activities. However, Dr. Huang's postural, manipulative, and environmental limitations are given little weight as they are overly restrictive in light of the claimant's reported activities. For those reasons, significant weight is also given to the State agency medical

---

[6] Plaintiff uses the expression "the ALJ provided erroneous reasons for" rejecting specific aspects of the reports of Drs. Huang and Foley. (Doc. 12-1, pp. 16-17) However, a plain reading shows that plaintiff's actual argument is that ALJ provided <u>insufficient</u> reasons.

consultants' assessments . . . .

(Doc. 10, pp. 25-26)  The ALJ wrote the following regarding Dr. Foley's report:

> As for the claimant's mental limitations, significant weight is given to Dr. Foley's psychological consultative evaluation . . . and the State agency psychological consultant's assessment . . . in restricting the claimant to simple and lower level detailed tasks. This is consistent with the claimant's ability to read, go to the library, and perform volunteer work.  However, the agency consultant's limitation of frequent interaction with coworkers and the general public and Dr. Foley's opinion that the claimant's history of anger problems could cause difficulty in a work setting are given little weight as such opinions are not consistent with the claimant's social activities, which include going to the library, taking public transportation, going to church, and living in a shelter with over six hundred people.

(Doc. 10, p. 26)

Whereas the opinions of a treating source generally are entitled to "controlling weight," the opinions of nontreating, examining sources such as Drs. Huang and Foley "are never assessed for 'controlling weight.'" *Gayheart*, 710 F.3d at 376-77 (quoting 20 C.F.R. § 404.1527(c)).  Moreover, although the ALJ is required to provide "good reasons" for discounting the weight given to the opinion of a "treating source," *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)), the ALJ is not procedurally required to give "good reason" for the weight given to the opinion of a nontreating examining source, *see Ealy*, 594 F.3d at 514-15.  Indeed, the ALJ is not required to explain his reasons for the weight he gives to the opinion of nontreating, examining sources.  *See Norris v. Comm'r. of Soc. Sec.*, 461 Fed.Appx. 433, 439 (6th Cir. 2012)("[A]n ALJ need only explain [hi]s reasons for rejecting a treating source statement because such an opinion carries 'controlling weight' under the SSA.")(citing *Smith v. Comm'r. of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)("[T]he SSA requires ALJs to give reasons for only *treating* sources." (italics for emphasis in the original)).  In short, the ALJ was not required to explain why he discounted parts of the reports

19

written by Drs. Huang and Foley. Consequently, this argument is without merit.[7]

### 3. Whether the ALJ Erred in Not Determining That Plaintiff Was Limited to Sedentary Work and, Therefore, Disabled Under the *Medical-Vocational Guidelines* (Doc. 12-1, pp. 17-19)

Plaintiff argues that the ALJ's determination that he was able to perform light work with limitations rather than sedentary work was "contrary to the medical evidence and fail[ed] to account for all of the limitations resulting from his severe impairments." (Doc. 12-1, p. 17) More particularly, plaintiff argues that, had the ALJ determined he was capable of "a maximum of sedentary work," the ALJ would have found him to be disabled. (Doc. 12-1, p. 18)

As previously discussed above at p. 16, the ALJ determined – correctly – that plaintiff was capable of performing light work with restrictions/limitations. Consequently, the first part of plaintiff's argument is without merit.

As to the second part of his argument, although plaintiff does not say so specifically, it appears that he is referring to 20 C.F.R Pt. 404, Subpt. P, App. 2, § 201.00(d), which provides that "[t]he adversity of functional restrictions to sedentary work at advanced age (55 and over) for individuals with no relevant past work or who can no longer perform vocationally relevant past work . . . warrants a finding of disabled . . . ." Plaintiff was 57 years of age when his filed his applications for benefits; therefore, he was a "person of advanced age" at all times relevant to the proceedings before the court. 20 C.F.R. § 404.1563(d). As a person of advanced age, had the ALJ determined that plaintiff was limited to sedentary work, he would have been disabled by definition.

The "grids" are employed by the ALJ "after the claimant has been found not to meet the requirements of a listed impairment but to nevertheless be incapable of performing past relevant

---

[7] The Magistrate Judge notes for the record that, for reasons explained herein, the ALJ's decision as to the opinions of Drs. Huang and Foley also is supported by substantial evidence.

work." *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008)(citation omitted). As shown above, the ALJ determined correctly that plaintiff had the ability to perform PRW. Because plaintiff was capable of performing PRW, the "grids" were not applicable. This part of plaintiff's argument also is without merit.

### 4. Whether the ALJ Erred in Not Properly Considering and Evaluating the Plaintiff's Mental Health Treatment Notes and His GAF Scores (Doc. 12-1, pp. 19-21)

Plaintiff argues first that the ALJ did not consider his TDOC medical record of mental impairments, that he has "consistently sought and received mental health treatment . . . including weekly counseling," that "despite his diligent treatment efforts and compliance, he [i]s still struggling with his mental health symptoms," that he continues to have "difficulties with daily activities and social interaction," etc., and that objective examinations have documented his mental impairments. (Doc. 12-1, pp. 19-21) There is no objective medical evidence in the record as to plaintiff's mental impairments. Plaintiff's complaints of mental problems, and the records pertaining thereto, are based solely on plaintiff's subjective representations. As previously established above at p. 13, plaintiff's subjective complaints are not sufficient to establish a disability. Moreover, as discussed above at pp. 13-15, plaintiff's claims as to his mental health are not credible. Consequently, this part of plaintiff's argument is without merit.

Plaintiff also argues that the ALJ "failed to evaluate [his] GAF scores in light of the medical evidence and treatment notes." (Doc. 12-1, p. 20) Notwithstanding plaintiff's assertion to the contrary, the record shows that the ALJ addressed plaintiff's GAF scores at length in his decision. (Doc. 10, pp. 22 -23, 25) In any event, a GAF score is not dispositive in and of itself, rather it is significant only to the extent that it elucidates an individual's underlying mental issues." *See Lee v. Comm'r of Soc. Sec.*, 529 Fed.Appx. 706, 716 (6th Cir. 2013)("'the commissioner has declined to

endorse the [GAF] score . . . and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings.'" (citations omitted)).  Although a GAF score "may be of considerable help to the ALJ in formulating the RFC . . . it is not essential to the RFC's accuracy."  *Howard v. Commissioner of Social Sec.* 276 F.3d 235, 241.  (6th Cir. 2002)(the ALJ's failure to refer to GAF score did not make his RFC analysis unreliable)).  Indeed, the ALJ is "not required to consider . . . GAF scores."  *Keeler v. Comm'r of Soc. Sec.*, 511 Fed.Appx. 472, 474 (6th Cir. 2013)(citing *Howard*, 276 F.3d at 241).  Because the ALJ is not required to consider GAF scores, this part of plaintiff's argument also is without merit.

## IV. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 12) be **DENIED** and the Commissioner's decision **AFFIRMED**.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file  written objections to the findings and recommendation proposed herein.  A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof.  Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal.  *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 26th day of March, 2015.


/s/ Joe B. Brown_____
Joe B. Brown
United States Magistrate Judge